[S. C., infra, 189.]
On the 9th of February, 1805, Forgey, at the instance of Henderson, purchased at execution sale a negro man, whom the sheriff sold to satisfy a debt due from Henderson, advancing for him, with a sum before advanced, to the amount of $284. Articles were drawn purporting that the money might be repaid in April, May, or June next following, and that the negro might be retained till the 1st of October, and then be returned. In March, 1806, an addition was made to the articles and signed by Henderson, declaring that the death of the negro should be the loss of Henderson. In 1807, the knee of the negro being affected with rheumatic pains, a plaster, by the direction of Forgey, was applied to his knee, which produced excoriations and sores that finally eventuated in death some time in the year 1809. After the application, being unable to labor, and growing worse every day, and being not furnished by Forgey with medical aid, one of the witnesses, understanding from Forgey that the death of the negro would be the loss of Henderson, requested that Forgey would send the negro to his house to be attended to and taken care of. He came eight or ten days afterwards, and, after staying one or two days, was removed in a cart or wagon to Robert Young's where were his children, and he there remained. In December, 1807, Robert Young purchased the negro from Forgey, who affirmed that Henderson was bound by the articles to pay the $284; that the death of the negro would be Henderson's loss, and that Robert Young should have the benefit of these articles. The articles were not then shown to Young; but he gave his bond for the $284, to be paid in three *Page 11 
months. Forgey sued upon it, and recovered. Young brought this bill, and obtained an injunction which hath been in part dissolved. And now the question is, Can Young be relieved upon this statement of facts? We will dismiss many points which might with propriety enough be drawn into discussion, and look at once for some ground that will serve as a foundation for our opinion.
Supposing the articles to be by law assignable, which however is very questionable (1 Ba. Ab. 370, 372), yet, as these articles were not assigned till after the dissolution of the injunction, it is manifest that Robert Young, when he filed this bill, could not have any benefit of these articles as against Henderson, so as to compel him to pay the $284. The same remark applies to any argument founded upon the Act of 1801, c. 6, section 54.
Again, if the articles were assignable, and had been actually assigned, Robert Young could not recover against Henderson, if at the time of the assignment, Forgey had disabled himself to recover of Henderson by any culpable act or omission. And then we must consider whether he was so disabled by the misapplication of the plaster, or neglecting to offer medical aid toward effecting a cure. The hirer of a slave is the owner in the place of the master during the continuance of the time stipulated. And as such he is bound to supply all those necessaries, including medical aid, which a good master ought to furnish to the slave who is under his care or protection. It is because of this obligation of the temporary owner that the price fixed for a year is not much, if at all, greater than the half of the price given for the work of a day laborer for whom the employer is not bound to provide. The temporary owner bears the loss of sickness, running away, and all other detrimental casualties to which the absolute owner would be liable but for the contract of hiring; *Page 12 
and is compensated in the diminution of the price he gives for the time stipulated. The temporary owner in this case, as in the case of a lease, must pay the consideration; though the house be burned down (1 Term Rep., 310; Newland, 325), so that he hath no enjoyment thereof, yet the rent is due and must be paid. He first sustains a loss coextensive with his time, the owner in fee the loss coextensive with his time. The same is the case of every temporary owner of a chattel so long as his ownership continues. Such particularly is the case of the pawnee, who, in point of reason, stands precisely on the same footing as the hirer. He is the temporary owner, and is subject to the duties during his time, which, but for the pawn, the absolute owner would be liable to. He must bear the loss of the thing pledged by his act or omission. If he had sued Henderson he could not have recovered; for he would have been met with the objection of a noxious administration of medicine which ruined the pledged property. At least he might have been met with the objection of gross neglect of that ordinary care which one of common prudence would have used for the preservation of his own property. He who claims under the pawnee is liable to the same objection. Convenience, humanity, and good policy all unite in the support of this position, that the temporary owner shall be onerated with the care of preserving the life, health, and limbs of the slave committed to his charge. He can then act immediately, without previous consultation with the master, whenever the emergency occurs; it will be his loss if he do not.
The evils to be apprehended from a different rule will be prevented by timely exertion and care; the slave will not be wantonly exposed to hardships which generate disorders. He will be furnished with food and raiment needful to such preservation, and cruelties which force him to absent himself will not *Page 13 
be practiced upon him. This, too, conforms to the principle of other cases, which decide that the bailee who is benefited by the possession, as well as the bailor, shall be bound to ordinary care, and shall be answerable for a correspondent neglect. Jones on Bailment, 74-78, 118-120; L. R. 97; 1 Ba. Alb. 370. It was not correct, as stated by Forgey, to say that a loss by the death of the negro would fall upon Henderson. He ought to have added, "unless some duty which the law imposes on the pledgee had been neglected, which in law would exempt Henderson from his liability." Young contracted under the idea that no exception could discharge Henderson. Such was not the effect of the articles; they were not correctly represented. He has been deceived by the generality of the affirmance. Forgey's duties were not transferred to Young, as between Young and himself, whatever allegation may lie in the mouth of Henderson. No such thing was expressly mentioned, nor can be implied from the nature of the transaction. Forgey representing that the loss was to fall on Henderson without exception of circumstances, it was clearly insinuated that he was the person bound for the cure of the slave. An idea wholly incompatible with Young's obligation to provide for it; and indeed is a negative of that proposition, — and so it is presumed did Young understand it. How, after this, could Forgey expect such provision to be made by Young? Did not both his example and deductions declare the contrary? If humanity required of Young to interfere in behalf of the slave a failure offends humanity, but does not violate his engagements with Forgey, who, by example and the form of his contract, and by his declarations then and afterwards made, has done all in his power to inspire a different conception in Young.
This controversy has arisen from a misunderstanding of the duties of the pawnee or mortgagee, but it is a misunderstanding which originated with Forgey, *Page 14 
and by him was communicated to Young. Reason determines therefore that Forgey, and not Young, should bear the consequences. Many times all parties are intentionally innocent, but yet some of them must bear the loss. That always is him who is the cause of the loss, however innocent he may be of any wrong intended. Where one of two innocent men must suffer, let the loss fall upon him who is the cause of the difficulty; in this instance Forgey's misconstruction of the contract between him and Henderson has been the cause of Henderson's now having a legal difference about payment of the $284; and therefore he Forgey, and not Young, should bear the loss.
A further view might be taken of this case, and others referred to, to prove that an assignment of one's demand does not also assign his obligations connected therewith so as to charge the assignee with them, as in case of covenant in gross to pay rent. But as the grounds already taken seem sufficient, we will not further investigate the analogous cases. See Salk. 81; Shower, 340; Doug. 735.
Decree for the complainant.